UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )</br>)</br>v.        )    Criminal No. 04-10336-NMG</br>)</br>JULIO CARRION SANTIAGO et al.  )</br>       Defendants    ) | |

**GOVERNMENT'S OPPOSITION TO MOTION TO SUPPRESS EVIDENCE
FILED BY DEFENDANT JOSE O. RODRIGUEZ**

**Introduction**

The Defendant, Jose O. Rodriguez ("Rodriguez"), has moved to suppress "the fruits of a police stop of a vehicle in which he was a passenger and the subsequent searches conducted thereafter." The government, by and through the undersigned attorney, now files its Opposition to the Motion to Suppress. For reasons set forth below, the Defendant's motion should be summarily denied.[1]

**Procedural History**

Twelve defendants, including Rodriguez, are charged in an eight-count Superseding Indictment. Rodriguez is charged in Count I (charging him and all of his co-defendants with conspiring to distribute and possess with intent to distribute one kilogram or more of heroin between in or about December 2003 to on or about October 15, 2004).

The conspiracy charge (and the other charges in the Indictment in which Rodriguez is not named) arise out of a long-term wiretap investigation conducted by agents and officers of the Drug

---

[1] The government has previously filed a Motion to Strike the defendant's Motion to Suppress due to its belated filing. If that motion is allowed, the instant filing is essentially moot.

Enforcement Administration ("DEA") and other law enforcement agencies. A fuller summary of this investigation is contained in the government's opposition to the motions to suppress of co-defendants Zuleima Reyes, Julio Santiago, Pedro Alberto Miranda (a/k/a Carlos Colon) and Edwin Torres, filed on June 6, 2005, and the government's opposition to Luis Sanchez's motion to suppress evidence obtained pursuant to court-authorized wiretaps, filed on June 27, 2005. For the purpose of addressing this limited motion, the government sets forth only the facts pertinent to Rodriguez's claims.

## Factual Background[2]

**Salient Pre-Wire Information**

In April 2003, Lowell Detective Felix Figueroa received information from two confidential informants regarding the heroin distribution activities of Rodriguez in Lowell. See Exhibit 1 ("Figueroa Aff." ¶ 2). After receiving this information, Lowell police applied for and received a state search warrant for Rodriguez's residence at 261 Aiken Avenue, 2nd Floor, Lowell. Id. On April 18, 2003, officers executed the warrant and uncovered a large quantity of heroin. See Exhibit 2 (Report of Det. Coughlin 2). Specifically, officers discovered the following items in Rodriguez's apartment: 77 heat-sealed baggies of heroin with a "spaceman" logo; one larger bag containing uncut heroin; $5,817 in cash; a Tanita digital scale; and personal papers belonging to Rodriguez and his live-in girlfriend, Pamela Goulart, who was present when officers executed the warrant. Id. Drug

---

[2]Unless otherwise noted, the following summary of facts is based upon the Affidavit of Drug Enforcement Administration ("DEA") Special Agent Calice Couchman ("Couchman Affidavit" or "Couchman Aff."), submitted in support of a criminal complaint against Rodriguez and eleven other co-defendants and an application for search warrants pertaining to six locations at various addresses. Several DEA and Lowell Police reports as well as a search warrant application for Rodriguez's apartment in April 2003 are attached to this memorandum as exhibits for the convenience of the Court.

ledgers were also found in Rodriguez's motor vehicle.  Id.

### Court-Authorized Interception of Wire Communications Confirm Santiago, Rodriguez and Others are Conspiring to Distribute Heroin

As detailed in the government's previous oppositions to motions to suppress, beginning in March 2004 the DEA wiretapped five telephones and one paging device belonging to Santiago and/or his associates. (Couchman Aff. ¶¶46, 48, 63).

Intercepted calls over the Target Telephones confirmed that Santiago was supplying large quantities of heroin not only to his main customer, Reynaldo Rivera, but was making regular deliveries to, and collecting drug monies from numerous other drug customers, including Rodriguez; that he had numerous drug associates including Rodriguez; and that he had a source of supply in New York (later identified as co-defendant Juan Nunez).

### Rodriguez Receives 60 Grams of Heroin from Santiago, Which is Subsequently Intercepted by Agents and the Lowell Police

At approximately 11:49 a.m. on June 6, 2004, during the course of an intercepted conversation, Santiago asked if Rodriguez "still need[ed] 'the money'" and Rodriguez answered affirmatively. (Couchman Aff. ¶49).  Santiago then indicated that he was going to take "sixty (60) dollars" out of the bank and would then call Rodriguez, but asked if Rodriguez would be there for sure so that Santiago did not make the trip for nothing. (Couchman Aff. ¶49).  Rodriguez assured that he would be there.  (Couchman Aff. ¶49).  Rodriguez indicated that he would be available before 3:00 p.m. (Couchman Aff. ¶49). Santiago then reiterated that he would withdraw "that" from that "account" and they agreed to speak again later. (Couchman Aff. ¶49).  TFA Marcos Chavez, who was monitoring this conversation and who had personally negotiated in undercover capacity with Rivera to purchase heroin, understood this intercepted conversation to mean that Santiago was

confirming that Rodriguez still wanted to purchase sixty (60) units of heroin and agreed to deliver them that afternoon.  (Couchman Aff. ¶49); See Exhibit 3 (Report of SA Colletti ¶2).

Surveillance was subsequently established shortly after noon near Santiago's residence.  (Couchman Aff. ¶50).  At approximately 2:30 p.m., a surveillance unit saw Santiago drive his vehicle ("Santiago minivan") out of a small lot behind his 264 Mechanic Street residence.  (Couchman Aff. ¶50).  At approximately 3:32 p.m., Santiago called Rodriguez, asked if the latter was available and indicated that he had been waiting for Rodriguez's call.  (Couchman Aff. ¶51).  Toward the end of the conversation, Santiago said he was leaving now to go "there" (meaning to meet Rodriguez).  (Couchman Aff. ¶51).  At approximately 4:06 p.m., Santiago called Rodriguez and indicated he was "there" but asked how things were because he saw too many cars there.  (Couchman Aff. ¶52).  Rodriguez reassured him that everything was fine and Santiago repeated that he had arrived.  (Couchman Aff. ¶52).

At approximately 4:10 p.m., four minutes after Santiago's last call to Rodriguez stating that he was "there," a surveillance agent saw Santiago driving the Santiago minivan slowly past Rodriguez's residence at 261 Aiken Street in Lowell.  (Couchman Aff. ¶53).  After parking Santiago's minivan, Santiago was seen seated in Santiago's minivan, bending and shifting from one side to another, as if retrieving something from the van's interior.  (Couchman Aff. ¶53).  Approximately one minute later, the surveillance agent saw Santiago exit Santiago's minivan and appear to fold something under and then pull the bottom of his shirt.  (Couchman Aff. ¶53).  Another surveillance officer then saw Santiago walk to the rear of the residence and walk up the stairs to Rodriguez's second-floor apartment at 261 Aiken Avenue.  (Couchman Aff. ¶53).  Less than 30 minutes later, at approximately 4:39 p.m., a third surveillance officer saw Santiago exit the

residence, return to the Santiago minivan and drive it out of the area. (Couchman Aff. ¶53). At approximately 6:40 p.m., a surveillance officer saw Rodriguez exit his apartment and walk from the rear of the premises out to Aiken Avenue, looking cautiously in all directions and with his right hand shoved deeply into the right pocket of his baggy running pants. (Couchman Aff. ¶53). Approximately a block and a half from his residence, Rodriguez saw and waved down a car driven by a Hispanic male later identified as Santiago Navarro. (Couchman Aff. ¶53). Rodriguez entered the front passenger seat of the BMW and the car then drove off. (Couchman Aff. ¶53).

A short while later, the BMW was stopped by police. (Couchman Aff. ¶54). Specifically, Lowell detectives stopped the BMW on Cabot Street in Lowell and ordered both occupants out of the car. See Exhibit 4 (Report of Det. Hanson 3). As Detective John Samaras pat-frisked Rodriguez a clear plastic baggie containing a "finger" of heroin (weighing approximately 10 grams) fell from Rodriguez's pant's leg. Id. A fully-loaded .22 caliber revolver was subsequently found wrapped in clothing within a carrying case and concealed under the driver's seat of the BMW. Id. A small amount of marijuana was also located in the vehicle. Id. The driver, Navarro, had $1,430 in cash on him, and Rodriguez had $270. Id. Both men were arrested. Id.

**A State Warrant is Issued Authorizing the Search of Rodriguez's Residence at 261 Aiken Avenue in Lowell for Heroin and Drug-Related Paraphernalia**

Following Rodriguez's arrest, the Lowell Police Department obtained a state warrant to search his apartment at 261 Aiken Avenue, 2nd Floor, Lowell. (Couchman Aff. ¶55); See Exhibit 1 (Figueroa Aff.). In that affidavit, Detective Figueroa not only recited the circumstances of the stop of the BMW and subsequent discovery of heroin on Rodriguez, but further described the previous investigation of Rodriguez for heroin distribution in April 2003 that resulted in the seizure of a

"large quantity" of heroin from Rodriguez's residence at 261 Aiken Avenue pursuant to a search warrant. (Figueroa Aff. II ¶2). During the search of Rodriguez's apartment pursuant to the warrant, an additional 50 grams of heroin were seized. (Couchman Aff. ¶55).

The sequence of intercepted calls between Santiago and Rodriguez, the subsequent surveillance and seizure from Rodriguez and Rodriguez's residence, confirmed that the "sixty dollars" referenced in Santiago's initial June 6 telephone conversation with Rodriguez was a coded reference to 60 grams of heroin (the 10 grams of heroin seized from Rodriguez's person and the 50 grams of heroin seized from his residence). (Couchman Aff. ¶55).

## Argument

### I. THE STOP AND SEARCH OF RODRIGUEZ AND THE SEIZURE OF HEROIN WERE LAWFUL

The Fourth Amendment to the United States Constitution expressly requires every search or seizure by a government agent to be reasonable. As a general rule, a warrantless search or seizure is presumptively unreasonable, Katz v. United States, 389 U.S. 357 (1967), unless it falls within one of the well-recognized exceptions to the warrant requirement. See Texas v. Brown, 460 U.S. 730, 735-36 (1983) (discussing "common-sense" exceptions to the warrant requirement). For reasons set forth below, the stop and search of Rodriguez (and all evidence flowing in part from it) fall squarely within several exceptions to the general warrant requirement and therefore the defendant's motion should be summarily denied.

**1. Probable Cause and Exigent Circumstances**

The initial stop and subsequent pat-frisk of Rodriguez were valid under the well-recognized probable cause and exigency exception. See United States v. Adams, 621 F.2d 41, 44 (1st Cir. 1980).

Probable cause for search is demonstrated when the "'facts and circumstances [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' he was observing criminal activity and the fruits of criminal activity." United States v. Ferrara, 539 F.2d 799, 801 (1st Cir. 1976) (quoting Carroll v. United States, 267 U.S. 132, 162 (1925)). Under the "fellow officer rule," a Court in this circuit evaluating the question of probable cause should consider the collective knowledge possessed by, and the aggregate information available to, all officers involved in the investigation. See Burns v. Loranger, 907 F.2d 233, 236 n.7 (1st Cir. 1990) ("joint knowledge of [defendant's] activities could legitimately be imputed to all agents acting in concert"); see also United States v. Meade, 110 F.3d 190, 193-94 (1st Cir. 1997) (collective knowledge of all investigators may establish probable cause to arrest). "In dealing with probable cause, [. . .], as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Brinegar v. United States, 338 U.S. 160, 175 (1949).

 Here, agents participating in the investigation of Santiago, Rodriguez and others, collectively knew that a search warrant executed at Rodriguez's apartment just 14 months earlier yielded a seizure of a substantial amount of heroin and other drug-related paraphernalia. Prior to stopping Rodriguez and the driver of the BMW, agents had intercepted coded communications between Rodriguez and Santiago indicating that Santiago would be delivering 60 units of heroin to the defendant at 261 Aiken Avenue within a short time frame. See Exhibit 3 (Colletti Report ¶ 2). Santiago asked Rodriguez to be ready so that he (Santiago) did not make a wasted trip. Police then corroborated the drop-off through physical surveillance. See Illinois v. Gates, 462 U.S. 213, 241-242 (1983) (discussing value of police corroboration in probable cause determination under totality of

circumstances and rejecting rigid application of Aguilar-Spinelli test). Santiago arrived at 261 Aiken Avenue within the time frame discussed during the telephone calls, appeared to retrieve something from his van, tucked it under his shirt and walked up to Rodriguez's apartment in a manner consistent with delivering the heroin.  Santiago stayed only for a short period of time. Approximately two hours later, Rodriguez left his apartment with his right hand placed deeply in his pant's pocket. He looked cautiously about the area in a manner consistent with counter surveillance. See Exhibit 4 (Hanson Report 2). A short distance from his residence, Rodriguez flagged down the BMW and entered the vehicle. The vehicle proceeded to leave the area.

Given the totality of the circumstances here, there was ample cause for a person of reasonable caution to believe Rodriguez was engaged in criminal activity and that fruits of criminal activity would be found on him. United States v. Ferrara, 539 F.2d at 801. Furthermore, agents and police were presented with exigent circumstances justifying the stop and search of Rodriguez without a warrant. See United States v. Wihbey, 75 F.3d 761, 766-68 (1st Cir. 1997) (exigency claim is evaluated in light of totality of circumstances and whether officers acted reasonably based upon the objective facts available to them). Rodriguez's entry into a mobile vehicle shortly after receiving heroin, a substance which is easily disseminated or destroyed, created an situation that called for immediate action. See United States v. Bartelho, 71 F.3d 436, 442 (1st Cir. 1995) (evaluating whether there is "such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant") (citations omitted). Simply put, the officers could not delay the stop and search of Rodriguez until a proper warrant could be secured without creating a grave risk that the

drugs would be "spirited away."  Florida v. White, 526 U.S. 559, 565 (1999).[3]

The scope of the search here – a simple pat-down – was circumspect and tailored to the context in which it was made.  Compare. Commonwealth v. Skea, 18 Mass. App. Ct. 685, 686-87 (1984) (upholding warrantless search of defendant's pockets after officer observed marijuana "roaches" on console of defendant's vehicle) with Thompson v. Louisiana, 469 U.S. 17, 22 (1984) (person's request for medical assistance does not permit full-blown warrantless search of home).  When the "finger" of heroin fell from the defendant's pant's leg during the pat-frisk, officers were entitled to make a plain view seizure of that item.  See Horton v. California, 496 U.S. 128, 136-37 (1990) (if police lawfully in position to view object, if incriminating character is immediately apparent, and if officers have lawful right of access to object, they may seize it); see Coolidge v. New Hampshire, 403 U.S. 443, 465 (1971) ("[w]here the initial intrusion that brings the police within plain view of such an article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate.").  For these reasons, the stop and search of Rodriguez and the attendant seizure of 10 grams of heroin were lawful.

**2. Probable Cause and Search Incident to Arrest**

Officers were also justified in searching Rodriguez incident to his lawful arrest.  Probable cause for arrest exists when, "'at the moment [the arrest is made,] the facts and circumstances within [the officers'] knowledge and of which they had reasonable trustworthy information were sufficient to warrant a prudent [person] in believing that the [individual] had committed or was committing an offense.'"  United States v. Winchenback, 197 F.3d 548, 555 (1st Cir. 1999) (quoting Beck v.

---

[3]Rodriguez, of course, does not have standing to contest the search of the driver, Navarro, or the BMW that Navarro was driving.  Rakas v. Illinois, 439 U.S. 128, 131 n.1 (1978) (defendant has the burden of proving standing); see also United States v. Cruz-Jiminez, 894 F.2d 1, 5 (1st Cir. 1990).

Ohio, 379 U.S. 89, 91 (1964). In this context, as in the probable-cause-to-search calculus, the Court properly considers "the collective knowledge possessed by, and the aggregate information available to, all officers involved in the investigation." Id. The First Circuit Court of Appeals has recognized, "[p]robable cause is a fluid concept. Its existence must be evaluated under the entirety of the circumstances." United States v. Lee, 317 F.3d 26, 32 (1st Cir. 2003) (citing Illinois v. Gates, 462 U.S. 213, 232 (1983)). Furthermore, probable cause for arrest does not require a police officers' determination "to be ironclad, or even highly probable. Their conclusion that probable cause exists need only be reasonable." United States v. Winchenbach, 197 F.3d 548, 555-56 (1st Cir. 1999).

As noted in detail above, officers and agents possessed ample trustworthy information to warrant a reasonably prudent person to conclude that Rodriguez was conspiring with Santiago to distribute heroin. They therefore had probable cause to arrest Rodriguez and were permitted to conduct a search incident to arrest of him. See Rawlings v. Kentucky, 448 U.S. 98, 111 (1980) (search of defendant incident to arrest yielding a knife and $4,500 in cash found lawful). That the search occurred before Rodriguez was formally arrested is immaterial. See United States v. Bizier, 111 F.3d 214, 219 (1st Cir. 1997) (search of defendant before formal arrest valid because police had probable cause to arrest based on earlier controlled purchases of drugs). Because a full search of Rodriguez for evidence of the crime may be made incident to arrest, see United States v. Robinson, 414 U.S. 218, 229 (1973), the limited pat-frisk of the defendant was reasonable. See Chimel v. California, 395 U.S. 752, 763 (1969) (scope of search incident to arrest extends to arrestee's person and area within arrestee's immediate control). The plain-view seizure of the finger of heroin that

fell from Rodriguez's pants therefore was lawful.[4]

### 3. Threshold Inquiry

Even assuming *arguendo* the collective knowledge of investigators did not amount to probable cause (a point the government does not concede), a secondary basis exists for finding the stop and search of Rodriguez as well as any "fruit" flowing from that action lawful. Against the backdrop of the previous seizure of heroin from Rodriguez's apartment at 261 Aiken Avenue, the wiretap intercepts indicating a heroin drop, and the observed behavior of Santiago and the defendant, the officers here at the very least had reasonable suspicion based on specific and articulable facts to believe that Rodriguez had committed or was committing a crime. See Terry v. Ohio, 392 U.S. 1, 30 (1968); United States v. Jones, 432 F.3d 34, 40 (1st Cir. 2005) (describing *Terry*-type standard). Stopping the vehicle in which Rodriguez was a passenger to conduct a threshold inquiry was manifestly reasonable in these circumstances.

"Reasonable suspicion is evaluated in the context of the totality of the circumstances and demands a 'practical, commonsense approach.'" United States v. Jones, 432 F.3d at 40 (quoting

---

[4] It is unclear from the defendant's motion and accompanying affidavit precisely what it is he seeks to suppress. Following his arrest, Rodriguez was taken to the Lowell Police Department and booked. TFA Marco Chavez, who speaks fluent Spanish, advised the defendant of his *Miranda* rights, which Rodriguez indicated he understood. See Exhibit 5 (Report of TFA Chavez ¶ 2). TFA Chavez then informed Rodriguez that no questions about his arrest would be asked of him. Id. Rodriguez, without being questioned, then blurted out in Spanish, "I cannot blame anyone for this. They found the finger on me, but I wasn't driving." Id. Any motion to suppress this statement must fail. TFA Chavez "scrupulously honored" the defendant's rights. See Miranda v. Arizona, 384 U.S. 436, 478 (1966) ("[v]olunteered statements of any kind are not barred by the Fifth Amendment"). Rodriguez's statement was not the product of police interrogation. Rhode Island v. Innis, 446 U.S. 291, 300 (1980) (interrogation does not include those actions "normally attendant to arrest and custody"); United States v. Taylor, 985 F.2d 3 (1st Cir. 1993)(response to defendant's inquiry did not constitute interrogation). Indeed, after informing Rodriguez of his rights under *Miranda*, TFA Chavez specifically told the defendant that no questions about his arrest would be put to him. Rodriguez nevertheless chose to make the admission. There is no reasonable basis in these circumstances to suppress Rodriguez's statement.

United States v. Sowers, 136 F.3d 24, 28 (1st Cir. 1998)). Having lawfully stopped the vehicle in the context of suspected narcotics trafficking activity, officers acted appropriately in ordering the driver, Navarro, and the passenger, Rodriguez, out of the vehicle. See Maryland v. Wilson, 519 U.S. 408, 415 (1997) (extending holding of Pennsylvania v. Mimms, 434 U.S. 106 (1977) to include the right of officers to order passengers our of a lawfully stopped vehicle). Similarly, officers were entitled to conduct a pat-frisk of Rodriguez to ensure their safety and the safety of those around them. See United States v. Gilliard, 847 F.2d 21 25 (1st Cir. 1988) (well founded suspicion of drug activity justified pat-frisk of defendant); United States v. Trullo, 809 F.2d 108, 111 (1st Cir.), cert. denied, 482 U.S. 916 (1987) (scope of warrantless intrusion in drug case, including stopping defendant, asking him to exit car, and pat-frisking him found reasonable). When the heroin fell from Rodriguez's pants during the pat-frisk, officers were entitled to make a plain view seizure of that item. See Horton v. California, 496 U.S. at 136-37. At that time, reasonable suspicion evolved quickly into probable cause to arrest. See e.g., United States v. Lee, 317 F.3d 26, 33 (1st Cir. 2003) (noting record supports trial court's determination that reasonable suspicion ripened into probable cause); United States v. Chhien 266 F.3d 1, 5-11 (1st Cir. 2001) (events occurring after lawful traffic stop lead to probable cause to arrest). Because the seizure of contraband occurred during a valid *Terry* stop, and because the defendant's arrest resulted from probable cause generated during that stop, Rodriguez cannot legitimately cry foul.

**II.    THE SEARCH OF RODRIGUEZ'S RESIDENCE PURSUANT TO A WARRANT WAS LAWFUL**

    **1.    The Search of Rodriguez's Home Pursuant to a Warrant Was Not "Tainted."**

The defendant here does not argue that the warrant lacked probable cause or was otherwise

defective. Rodriguez simply claims that the search warrant obtained for his apartment was the product of a prior illegality – namely, the earlier stop of the defendant and seizure of heroin – and therefore the fruits of the search of his dwelling must be suppressed under Wong Sun v. United States, 371 U.S. 471 (1963) and its progeny. As detailed above, however, the stop and search of the defendant in this case were entirely lawful. There being no prior illegality to "taint" the search warrant or the "fruits" of any search garnered pursuant to the warrant's authorization, Rodriguez's motion must fail. See e.g., United States v. Barthelho, 71 F.3d 436, 442 (1st Cir. 1995) (because prior warrantless search valid under probable cause and exigent circumstances, court does not consider argument that subsequent search warrant was tainted by prior illegality).

### 2. The Issuance of the Search Warrant was Otherwise Proper.

It is abundantly clear that the information set forth in Detective Figueroa's affidavit established probable cause to believe that the defendant was engaged in heroin possession and distribution, and that evidence of that crime would likely be found inside Rodriguez's residence. United States v. Zayas-Diaz, 95 F.3d 105, 111 (1st Cir. 1996). Not only did Detective Figueroa describe the stop of Rodriguez and subsequent discovery of a "finger" of heroin on him (after Rodriguez had just left the rear of 261 Aiken Avenue), but Figueroa also informed the magistrate that the very same apartment occupied by Rodriguez had been searched just 14 months earlier by police and that a large quantity of heroin had been found inside. Although there is no per se probable cause to search a drug suspect's residence, it is well settled that "[e]vidence of involvement in the drug trade is likely to be found where the dealers reside." United States. v. Whitner, 219 F.3d 289, 297-98 (3rd Cir. 2000) (collecting cases); see, e.g., United States v. Feliz, 182 F.3d 82, 88 (1st Cir. 1999).

Review of an issuing magistrate's probable cause determination is deferential. "Reflecting this preference for the warrant process, the traditional standard for review of an issuing magistrate's probable cause determination has been that so long as the magistrate had a 'substantial basis...conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." Illinois v. Gates, 462 U.S. 213, 236 (1983) (quotation omitted). Accordingly, the reviewing court must accord "considerable deference" to the determination of probable cause by the magistrate. See Zayas-Diaz, 95 F.3d at 111; see also United States v. Taylor, 985 F.2d 2, 5 (1st Cir. 1993). Along this vein, the reviewing court must examine the affidavit in a practical, common sense fashion, and accord considerable deference to reasonable inferences the issuing magistrate may have drawn from the facts presented in the sworn affidavit. United States v. Bucuvalas, 970 F.2d 937, 940 (1st Cir. 1992); see United States v. Jewell, 60 F.3d 20, 23 (1st Cir. 1995) (citing the totality of the circumstances test and rejecting the defendant's invitation to "engage in a piecemeal examination of the affidavit," and to base review on "bits and pieces of information in isolation"). The inquiry is whether the magistrate (or magistrate judge) had a "substantial basis" for concluding that probable cause existed. United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999) (quoting Taylor, 985 F.2d at 6); United States. v. Whitner, 219 F.3d 289, 291-92 (3rd Cir. 2000) (quoting Gates, 462 U.S. at 238).

Taking a commonsensical approach to the facts presented in the affidavit, the totality of circumstances presented in the search warrant clearly show that there was a substantial basis for concluding that heroin, drug paraphernalia and all the other items enumerated in the search warrant would be found in Rodriguez's residence. The warrant itself, therefore, withstands any perceived

constitutional challenge.

### 3. The Good Faith Exception Under *Leon*

Even if the Court were to find that Figueroa's Affidavit failed to establish probable cause to search 261 Aiken Avenue, the evidence seized there should not be suppressed under United States v. Leon, 468 U.S. 897 (1984). Since no deterrent purpose is served by sanctioning "objectively reasonable" law enforcement conduct, the "extreme sanction" of exclusion is inapplicable to evidence seized pursuant to a search warrant obtained in an "objectively reasonable" manner from a neutral magistrate, even assuming the warrant or supporting affidavits were defective. Leon, 468 U.S. at 922, 926; Zayas-Diaz, 95 F.3d at 113; United States v. Ricciardelli, 998 F.2d 8, 15 (1st Cir. 1993). With the issuance of a search warrant, "exclusionary rule" deterrence is appropriate in certain, limited circumstances where: "(1) the magistrate is 'misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth'; (2) the magistrate 'wholly abandon[s] his [detached and neutral] judicial role'; (3) the warrant is 'so facially deficient [e.g., failing to list, with sufficient particularity, the evidence to be seized] ... that the executing officers cannot reasonably presume it to be valid'; or (4) the supporting affidavits is 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" Zayas-Diaz, 95 F.3d at 113 (quoting Leon, 468 U.S. at 923). None of these circumstances are presented in this case.

The Figueroa Affidavit and the search warrant are within the bounds of the Leon good faith exception. Nothing in the affidavit or in the record or in Rodriguez's Memorandum suggests that the state magistrate was misled by information contained in the affidavit that the affiant either knew

was false or should have known was false. Cf. United States v. Vigeant, 176 F.3d 565, 572 (1st Cir. 1999) (good faith exception inapplicable because of material omissions and false and misleading statements contained in affidavit); Ricciardelli, 998 F.2d at 16 (officers' failure to disclose fact that package might not even be delivered to premises in affidavit for anticipatory search warrant led to subsequent invalidation of the warrant). Likewise, there is no evidence to suggest that magistrate "wholly abandoned" his judicial role as a neutral and detached magistrate when he signed/authorized the search warrant application. Leon, 468 U.S. at 923.

Finally, it cannot be said that the Affidavit was either "so lacking in indicia of probable cause" or "so facially deficient i.e. in failing to particularize the place to be searched or the things to be seized," that even the affiant should have realized that probable cause was a reach or that the warrant was patently invalid. Leon, 468 U.S. at 923. On the contrary, the Figueroa Affidavit was prepared and presented in a thorough and detailed manner. The affidavit did not include mere conclusory statements, but a detailed summary of the stop of Rodriguez and the results of a prior search at his residence. A well-trained law enforcement officer reasonably could have relied upon the Figueroa Affidavit as adequate support for the issuing magistrate's finding that there was a fair probability that the enumerated items would be located at 261 Aiken Avenue. Zayas-Diaz, 95 F.3d at 116. Therefore, even assuming *arguendo* that the Court finds that probable cause was lacking to search 261 Aiken Avenue, the government contends that the good faith exception under Leon justifies preservation of any evidence seized. See United States v. Varjabedian, No. 05-10103-GAO (D. Mass. April 14, 2006) (citing *Leon* and noting that penalizing police officer for magistrate's error, rather than his own, does not logically contribute to purpose of exclusionary rule).

## Conclusion

For all of the aforementioned reasons, the government respectfully requests that the Court deny Rodriguez's Motions to Suppress.

        Respectfully submitted,
        MICHAEL J. SULLIVAN
        United States Attorney


By:    /s/:  William F. Bloomer
        WILLIAM F. BLOOMER
        Assistant U.S. Attorney
        BBO# 553104
        william.bloomer@usdoj.gov
        (617) 748-3644


## CERTIFICATE OF SERVICE

I, William F. Bloomer, hereby certify that this document filed through the ECF system on April 19, 2006, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non registered participants this date via US Postal Service, postage prepaid.

        /s/:  William F. Bloomer
        WILLIAM F. BLOOMER

Date: 19 April 2006